# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
|  | Case No. 08-11006 (BLS) |
| **Jevic Holding Corp.**, *et al.*, | (Jointly Administered) |
| Debtors. |  |
| **Casimir Czyzewski, Melvin L. Myers, Jeffrey Oehlers, Arthur E. Perigard, and Daniel C. Richards, on behalf of themselves and all others similarly situated,** | Adv. No. 08-50662 |
| Plaintiffs, |  |
| v. | Related to Adv. Docket Nos. 3, 191, 192, 215, & 218 |
| **Jevic Transportation, Inc., Jevic Holding Corp., Creek Road Properties, LLC, Sun Capital Partners, Inc., and John Does 1-10,** |  |
| Defendants. |  |

LOIZIDES, P.A.
Christopher D. Loizides, Esq.
1225 King Street
Suite 800
Wilmington, DE 19801

-and-

KLEHR HARRISON
HARVEY BRANZBURG
LLP
Domenic E. Pacitti, Esq.
919 Market Street,
Suite 1000
Wilmington, DE 19801

*Counsel for Defendants Jevic Transportation, Inc. and Jevic Holding Corp.*

OUTTEN & GOLDEN LLP
Jack A. Raisner, Esq.
Rene S. Roupinian, Esq.
3 Park Avenue
29th Floor
New York, NY 10016

*Counsel for Plaintiffs and the
Certified WARN Class*

# OPINION[1]

Before the Court is a motion for summary judgment on claims arising under the WARN Act.[2]  Casimir Czyzewski, Melvin L. Myers, Jeffrey Oehlers, Arthur E. Perigard, and Daniel C. Richards, on behalf of themselves and all others similarly situated (collectively, the "Class Plaintiffs") initiated this adversary proceeding against Defendants Jevic, Jevic Holding Corp., Creek Road Properties, LLC (collectively, the "Debtors"), and Sun Capital Partners, Inc. ("Sun Cap"), the Debtors' ultimate parent.[3]  After the close of discovery, Class Plaintiffs filed a motion for summary judgment (the "MSJ") [Adv. Docket No. 191] arguing that the Debtors are liable under the WARN Act and the New Jersey WARN Act because they did not give employees sufficient notice of termination and further contending that the Debtors cannot demonstrate that they should be excused from complying with these statutes.  For the reasons that follow, the Court will grant Class Plaintiffs' MSJ in part and deny in part.

## I. BACKGROUND

The material facts are largely undisputed.  Jevic Transportation, Inc. ("Jevic") began operations in 1981 and described itself as providing a hybrid less-than-truckload and truckload carrier service for regional

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedure.  *See* Fed. R. Bankr. P. 7052, 9014(c).

[2] Defined terms used in this introduction are defined *infra*.

[3] This Opinion pertains solely to the Debtors.  The claims and summary judgment motions that relate to Defendant Sun Cap are discussed and adjudicated in a separate companion Opinion issued contemporaneously herewith.  *See* Adv. Docket Nos. 182, 196.

and inter-regional time definite delivery across the United States and parts of Canada. All of the Debtors' operations occurred through Jevic. Prior to filing these chapter 11 cases in 2008, Jevic employed approximately 1,785 employees and was headquartered in Delanco, New Jersey with its largest terminal located there. The Debtors operated nine additional terminals and one sales office throughout the United States. Debtor Creek Road Properties, LLC held no assets and had no operations. Similarly, Debtor Jevic Holding Corp. had no independent operations, but owns 100% of the issued and outstanding stock of Jevic.

Beginning in 2006, the Debtors' revenue declined due to a variety of factors including the decline in the housing market, the tightening of the credit markets, and the slowdown in the automotive industry, all of which led to a nationwide decline in freight volumes.[4] In early 2006, the Debtors contemplated a sale or liquidation, and even filing for bankruptcy.[5]

On June 30, 2006, Sun Transportation, LLC ("Sun Trans"), a wholly-owned subsidiary of Defendant Sun Cap acquired the Debtors in a leveraged buyout, which included an $85 million revolving credit facility from a bank group led by CIT. Sun Cap, through Sun Trans, paid $1 million to Jevic Holding Corp., which was created to effectuate the acquisition of all of Jevic's shares. CIT's financing agreement required that the Debtors maintain assets and collateral of at least $5 million in order to access its line of credit.

Throughout 2007, the Debtors' business struggled due to the general economic downturn and the negative impact of fuel surcharges on its profitability. While the Debtors instituted cost-saving strategies, Sun Cap proposed to CIT numerous capital investments in the Debtors in exchange for increased credit availability. By the end of 2007, the Debtors' assets fell below $5 million, in default of CIT's financing covenant. Thereafter, CIT and the Debtors entered into a forbearance agreement that went into effect on January 8, 2008 and was set to expire on February 29th.[6] The forbearance agreement called for Sun Cap to provide a $2 million guarantee, which it did. Jevic met all of CIT's requirements during the first forbearance period.[7] When the

---

[4] *See* Gorman Decl. ¶ 18 [Docket No. 3].

[5] *See* Pls.' App. 151, Gillen Dep. 84:13-20, Aug. 8, 2012 [Adv. Docket No. 193].

[6] *See* Pls.' App. 335 (discussing CIT and Jevic's transaction history through a forbearance agreement).

[7] *Id.*

forbearance period was about to expire, CIT agreed to extend the forbearance period through April 2008.

In February 2008, Jevic entered into an agreement for consulting services with Morris Anderson & Associates, Ltd. ("Morris Anderson"). By the end of February, Morris Anderson prepared and circulated a 13-week cash flow projection showing that Jevic would keep assets and collateral above the $5 million limit until at least May 9, 2008.

Also in February, Jevic entered into an agreement with Black Management Advisors to retain Brian Cassady as Interim Vice President. Cassady's engagement was to provide consulting services consisting of operational and financial consulting as well as advice and recommendations to Jevic on strategic, management, operational, financial, and business restructuring matters as requested by Jevic's board. Additionally, Jevic retained investment bank Stifel Nicolaus to seek potential buyers for the company.

On March 27, 2008, CIT presented Sun Cap with two options: (i) Sun Cap would invest additional funds in Jevic in exchange for a long-term forbearance agreement; or (ii) Sun Cap would receive 45-day forbearance, which was set to expire on May 19th, in exchange for beginning an active sale process.[8] Sun Cap chose not to invest more money in Jevic, and Jevic therefore began an active sale process.

In early April 2008, Daniel Dooley, a Morris Anderson employee who was working on the Jevic project, was retained as the Debtors' Chief Restructuring Officer ("CRO"). Jevic announced a reorganization plan, which included closing unprofitable facilities and liquidating assets. Implementation of this plan was intended to allow Jevic to realize monthly savings and maintain its assets above $5 million. The reorganization would not be fully implemented until the beginning of June 2008, by which time Jevic was estimated to save approximately $1.0-1.4 million monthly. However, decreased sales, increasing costs, and disappointing equipment appraisal values meant that Jevic failed to meet its earlier optimistic projection. By the end of April, Jevic's assets again fell below $5 million, in default of CIT's financing covenant.

During these months, Jevic met with two potential buyers, Pitt Ohio and New Century, and Pitt Ohio submitted a bid letter expressing

---

[8] Another forbearance agreement granted by CIT shortened the date until May 12th.

preliminary interest.[9]  However, neither buyer was willing to sign a non-disclosure agreement, which halted the sale process. Jevic also met with the New Jersey Economic Development Authority ("NJEDA") to seek capital,[10] but to no avail.

By May 13, 2008, Jevic had only two options: sell the company to Pitt Ohio or prepare for bankruptcy.  CIT refused to fund further borrowing unless Sun Cap invested more money to fund a bridge to complete the sale to Pitt Ohio.  Sun Cap would need to spend more money to close the sale than the sale would generate, which it was unwilling to do.  Three days later, on May 16, 2008, with no viable sale or funding available to Jevic and with the forbearance agreement with CIT expiring, Jevic's board formally authorized a bankruptcy filing.

Jevic sent its employees notice of their termination pursuant to the Worker Adjustment and Retraining Notification Act (the "WARN Act") that was received on May 19, 2008.  The notice stated that Jevic "was seeking financing or other alternatives that would have enabled it to continue operations.  However, it has been unsuccessful due in part to the unforeseeable tightening of the credit markets."[11]  The Debtors sent a "Company Update" the same day that explained the reasons for Jevic ceasing operations as "[r]ecord high fuel costs, an economic downturn that has impacted freight volumes, higher insurance costs, and a tightening credit market[, which] have made this decision necessary."[12]

The next day, May 20, 2008, the Debtors filed a voluntary petition in this Court under chapter 11 of the Bankruptcy Code.  On May 23, 2008, the Class Plaintiffs filed this adversary proceeding by its amended class action complaint against the Debtors and Sun Cap alleging WARN Act and New Jersey WARN Act violations for failing to provide employees with the required 60-day notice before a plant closing or mass layoff.[13]  The Court certified the class and directed the named Plaintiffs as the class representatives.[14]

---

[9] *See* Defs.' App. 34-35, Dooley Dep. 201:20-202:5, Aug. 21, 2012 (discussing the Pitt-Ohio sale) [Adv. Docket No. 216]; Defs.' App. 62-64, Gorman Dep. 268:24-270:6, Sept. 4, 2012 (discussing the New Century sale).

[10] *See* Defs.' App. 42, Gorman Dep. 87:12-23 (discussing the NJEDA meeting).

[11] Pls.' App. 576 [Adv. Docket No. 193]

[12] *Id.* at 578.

[13] Adv. Docket No. 3.

[14] Adv. Docket No. 28.  The Court issued an Order amending the certification of the class on May 16, 2008 [Adv. Docket No. 29].

On November 15, 2012,[15] Class Plaintiffs filed their MSJ and memorandum in support.[16] The Debtors filed an answering brief on November 14, 2012[17] and Class Plaintiffs filed a reply December 3, 2012.[18] The matter has been fully briefed and argued, and is ripe for decision.

## II. THE PARTIES' POSITIONS

Class Plaintiffs argue that the Debtors are liable under the WARN Act and the New Jersey WARN Act for failing to provide employees with sufficient notice of their termination. Class Plaintiffs allege that the notice provided was inadequate because it was vague, with insufficient explanation of the reasons behind the Debtors' demise. Class Plaintiffs next argue that even if the notice was adequate, it was not within the required sixty-days and the Debtors cannot satisfy either the Faltering Company or Unforeseeable Business Circumstances exceptions (as discussed *infra*). They also argue that, at a minimum, summary judgment is warranted at least as to the New Jersey WARN Act because it does not provide for these exceptions.

In response, the Debtors argue that they provided employees with adequate WARN notice and sufficient detail. The Debtors also argue that they did not need to give sixty-days notice because the Debtors qualify under both the Faltering Company and Unforeseeable Business Circumstances exceptions.[19]

## III. JURISDICTION & VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), (b)(1), and 1334(b). Venue is proper pursuant to §§ 28 U.S.C. 1408 and 1409. Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(A), (B), and (O).

---

[15] In the lengthy intervening period, the Court granted, by agreement of the parties, numerous amended scheduling orders to extend fact discovery and dispositive motion deadlines. The Court denied by Order dated September 25, 2012 Class Plaintiffs' motion to further extend discovery. *See* Adv. Docket No. 181.

[16] Adv. Docket Nos. 191, 192.

[17] Adv. Docket No. 215.

[18] Adv. Docket No. 218.

[19] The Debtors do not posit an argument against summary judgment in favor of the Class Plaintiffs for the New Jersey WARN Act violations. They also do not dispute that the New Jersey WARN Act does not provide for any exceptions.

# IV. LEGAL ANALYSIS

## A. Summary Judgment Standard

Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party and drawing all inferences in favor of that party, there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986). Any doubt must be resolved in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The movant bears the initial burden of establishing that no genuine dispute of material fact exists. *See, e.g., D'Amico v. Tweeter Opco, LLC (In re Tweeter Opco, LLC)*, 453 B.R. 534, 539 (Bankr. D. Del. 2011). Once the moving party carries its burden, the opposing party must go beyond the pleadings and identify specific facts showing more than "[t]he mere existence of a scintilla of evidence" that a genuine dispute of material fact exists. *Anderson*, 477 U.S. at 252; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts").

At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine dispute for trial. *Celotex*, 477 U.S. at 317. If there is a genuine dispute of material fact, the Court cannot grant summary judgment. *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del. 2005). Further, substantive law determines which facts are material. *Anderson*, 477 U.S. at 248. Only facts that "might affect the outcome of the suit under governing law" are considered material and will preclude summary judgment. *Id.* A dispute regarding a material fact is genuine "when reasonable minds could disagree on the result." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## B. The WARN Act

The WARN Act provides that "[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order" to each affected employee. 29 U.S.C. § 2102(a)(1); *see also* 20 C.F.R. § 639.2 (stating that the 60-day period for advance notice is the minimum). The purpose of the WARN Act is to protect workers and their families by providing them with advance notice of a layoff. 20 C.F.R. § 639.1(a). This advance notice is intended to provide "workers and their families some

transition time to adjust to the prospective loss of employment" and to seek alternative jobs. *Id.*

The WARN Act defines an "employer" as "any business entity" that employs 100 or more employees." 29 U.S.C. § 2101(a)(1). It is undisputed that the Debtors constituted an "employer" under the WARN Act and did not give its employees the required 60-day notice before termination. The Debtors sent WARN notice on May 16, 2008 that was received by employees on May 19, 2008, along with a company update letter.[20] The Debtors filed for chapter 11 the following day and the letter stated that the Debtors' facility in Delanco, New Jersey would be permanently shut down on or about June 30, 2008.[21] Therefore, it is undisputed that the Debtors were required by the WARN Act to give employees 60-day notice and they failed to do so.

However, the inquiry does not stop there. The WARN Act provides for certain exceptions—Faltering Company, Unforeseeable Business Circumstances, and Natural Disaster—that provide an exception to the 60-day notice requirement. An employer may only invoke these exceptions if the employer gives "as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3); *see also In re Tweeter Opco, LLC.*, 453 B.R. at 546-47 (holding that an employer must "(i) give as much notice as is practicable and (ii) set forth specific facts in the notice that explain the reason for reducing the notice period" in order to invoke the exceptions). Thus, as a preliminary matter, the Court must determine whether the Debtors' notice to its employees was adequate.

Congress intended that the "brief statement" describing the basis for the shortened notice be "something more than a citation to the statute or a conclusory statement summarizing the statutory provision." *In re Tweeter Opco, LLC.*, 453 B.R. at 547; *see also Alarcon v. Keller Indus., Inc.*, 27 F.3d 386, 390 (9th Cir. 1994) (holding that a statement simply citing the statutory exception to the WARN Act "provides no understanding of the underlying condition or state of affairs causing the shortened notice, and it lacks any semblance of specificity or detail").

Class Plaintiffs argue that the exceptions are not available because the Debtors did not give adequate WARN Act notice. The Court disagrees. The Debtors' notice provided that they were "seeking

---

[20] *See* Pls.' App. 576, 578 [Adv. Docket No. 193].

[21] *Id.* at 576.

financing or other alternatives that would have enabled it to continue operations. However, it has been unsuccessful due in part to the unforeseeable tightening of the credit markets."[22]  The Debtors updated employees with an additional notice on the day that they received the WARN notice.  This update stated: "Why is Jevic ceasing operations? Record high fuel costs, an economic downturn that has impacted freight volumes, higher insurance costs, and a tightening credit market have made this decision necessary."[23]  The Debtors' WARN notice was sufficient to satisfy the "brief statement" requirement because it explained the reason for the late notice.  Additionally, the follow-up letter gave further specificity for the short notice and reasons for the employees' termination.  The Debtors did not simply quote the statute, but instead provided employees with some, albeit brief, explanation for the short notice and for their termination.  The Court finds that this notice was sufficient to permit the Debtors to invoke the exceptions laid out in 29 U.S.C. § 2102.

## C. Faltering Company Defense

Having found that there are no genuine disputes of material fact that the Debtors violated the WARN Act and that the Debtors may be eligible to invoke the WARN Act exceptions, the Court now turns to the Faltering Company exception.  The WARN Act provides

> An employer may order the shutdown of a single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business.

29 U.S.C. § 2102(b)(1).  The Code of Federal Regulations states that in order to invoke this exception the employer must prove:

> (1) it was actively seeking capital at the time the 60-day notice would have been required, (2) it had a realistic opportunity to obtain the financing sought, (3) the financing would have been sufficient, if obtained, to enable the employer to avoid or postpone the shutdown, and (4) the employer reasonably and in good faith believed that

---

[22] *Id.*

[23] *Id.* at 578.

> sending the 60-day notice would have precluded it from
> obtaining the financing.

*In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 246-47 (3d Cir. 2008) (summarizing 20 C.F.R. §§ 639.9(a)(1)-(4)).  This exception "should be narrowly construed."  20 C.F.R. § 639.9(a).  "Actively seeking capital" refers to "financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of internally generated financing; or the employer must have been seeking additional money, credit, or business through any other commercially reasonable method."  *Id.* § 639.9(a)(1).    Additionally, the employer "must demonstrate that it was taking the specific steps required 'at the time that 60-day notice would have been required.'"  *In re APA Transp. Corp.*, 541 F.3d at 247 (quoting 20 C.F.R. § 639.9(a)); *see also United Paperworkers Int'l Union, AFL-CIO, CLC v. Alden Corrugated Container Corp.*, 901 F. Supp. 426, 441 (D. Mass. 1995) ("Thus, to avail itself of this defense an employer must prove the specific steps it had taken, at or shortly before the time notice would have been required, to obtain a loan, to issue bonds or stock, or to secure new business.").

The Debtors argue that they satisfy the four requirements of the Faltering Company exception because Jevic was actively seeking additional funding from CIT, NJEDA, Sun Cap, and potential financiers of an equipment sale/leaseback transaction during the 60-day notice period.[24]  They state that "Plaintiffs incorrectly claim that the record does not reflect any attempt by Jevic to obtain financing during the notice period, and they fault Jevic for not attempting to locate additional funding until after March 20, 2008."[25]  The Debtors then state that there was no need to seek financing until April, and they should still be able to invoke this exception without a showing that they were actively seeking financing on March 20th (60 days prior to receipt by employees of the WARN notice).

This argument fails under both the express terms of the WARN Act and established case law.  In *In re APA Transport Corp.*, the plaintiffs argued that "if an employer does not foresee that it is 60 days away from a plant closing, it should not be held liable for failing to take specific steps at the time to secure financing."  541 F.3d at 248.  The Third Circuit, in disregarding that argument, stated that "[w]e believe

---

[24] *See* Defs.' Ans. Br. 10 [Adv. Docket No. 215].

[25] *Id.* at 12.  March 20th reflects the date where notice would have been required to comply with the WARN Act because it is approximately sixty days before employees were terminated.

such an approach runs counter to both the text and the purpose of the WARN Act." *Id.* The WARN Act requires that the employer be actively seeking capital "as of the time that notice would have been required." 29 U.S.C. § 2102(b)(1). And the regulations explicitly state to construe this exception narrowly. 20 C.F.R. § 639.9(a). Taken together, and with the undisputed evidence that the Debtors were not actively seeking capital on or before March 20th, the Court finds that there are no genuine dispute of material fact that the Debtors cannot establish the Faltering Company exception.[26]

### D. Unforeseeable Business Circumstances

The WARN Act provides that "[a]n employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A). The Department of Labor's ("DOL") regulations state that "[a]n important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control." 20 C.F.R. § 639.9(b)(1). The DOL's test for determining when business circumstances are not reasonably foreseeable

> focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of a particular market. The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services.

*Id.* § 639.9(b)(2).

The case law makes clear that the determining factor on the foreseeability issue is whether the triggering event was probable or possible. *See, e.g.*, *Halkias v. Gen. Dynamics Corp.*, 137 F.3d 333, 336 (5th Cir. 1998) ("We can only conclude that it is the probability of occurrence that makes a business circumstance 'reasonably foreseeable' and thereby forecloses use of the [Unforeseeable Business Circumstances] exception…."); *see also Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 589 (7th Cir. 2005) ("In determining whether a crippling

---

[26] Since it is undisputed that the Debtors cannot meet the first requirement of the exception, the Court need not discuss the other requirements under this exception.

business circumstance is foreseeable, we must bear in mind that 'it is the probability of occurrence that makes a business circumstance reasonably foreseeable, rather than the mere possibility of such a circumstance.'") (citing *Watson v. Mich. Indus. Holdings, Inc.*, 311 F.3d 760, 765 (6th Cir. 2002)) (internal quotation marks omitted).  Moreover, the triggering event does not need to be an "out-of-the-blue" event, as Plaintiffs argue,[27] for it to be considered "sudden, dramatic, or unexpected."  *See Roquet*, 398 F.3d at 590 ("Case law reveals that WARN Act defendants need not show that the circumstances which caused a plant closing or mass layoff arose from out of the blue to qualify for the exception."); *see also Hotel Employees & Rest. Employees Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 187 (3d Cir. 1999) (holding that the Unforeseeable Business Circumstance exception applied even though the casino owner knew that the Casino Control Commission might revoke its license, forcing a shutdown).  Rather, the company must show that it reacted "the same way that other reasonable employers within its own market would react."  *Roquet*, 398 F.3d at 588.

The Court evaluates this WARN Act exception objectively and at the time the decisions were made.  *See Elsinore Shore Assocs.*, 173 F.3d at 186 ("[W]e evaluate whether a 'similarly situated employer' in the exercise of commercially reasonable business judgment would have foreseen closing.") (citations omitted); *In re Advanced Accessory Sys., LLC*, 443 B.R. 756, 765 (Bankr. E.D. Mich. 2011) ("The Court looks to whether Defendant's judgment was reasonable at the time decisions were made, not at whether Defendant's judgment ultimately proved to be correct.").  The WARN Act allows leeway for a company's exercise of reasonable business judgment, and the regulations "are intended to encourage employers to take all reasonable actions to preserve the company and the jobs."  *Angles v. Flexible Flyer Liquidating Trust (In re Flexible Flyer Liquidating Trust)*, No. 12-60242, 2013 WL 586823, at *4 (5th Cir. February 11, 2013).  Thus, to satisfy the requirements of the Unforeseeable Business Circumstances exception, the Debtors must establish that (1) the termination of funding by CIT and Sun Cap, and the Debtors' prompt collapse thereafter, were unforeseeable, and (2) the layoffs were caused by that termination of credit.  *See, e.g., Gross v. Hale-Halsell Co.*, 554 F.3d 870, 876 (10th Cir. 2009).

The Debtors argue that they are not liable under the WARN Act because they satisfy the Unforeseeable Business Circumstance exception to providing sixty-days notice of a mass layoff.  The Debtors

---

[27] *See* Hr'g Tr. 104:4-14 [Adv. Docket No. 236].

argue that they had no reason to think that CIT would not continue to extend forbearance as it had done in the past, and CIT's unwillingness to do so created an immediate crisis that was out of Jevic's control. The Debtors allege that they used their business judgment in assuming CIT would continue to forbear to allow them time to secure additional financing.

The Class Plaintiffs contend that the Debtors cannot satisfy the requirements of this exception because many of the problems that the Debtors faced did not arise suddenly, and CIT refusing a further extension of the forbearance agreement was not unforeseeable. They also allege that Jevic was never able to fund its operations from its own cash flow and therefore, the Debtors bankruptcy was not unforeseeable.

The Court first finds that there is no genuine dispute of material fact that CIT's refusal to extend forbearance was unforeseeable. Although CIT's refusal to extend forbearance was a possibility, it cannot be said that it was the probable outcome when notice would have been required, *i.e.*, on or before March 20th. *See Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 589 (7th Cir. 2005) ("Andersen's subsequent negotiations with the government do not mean that it knew an indictment was likely. Possible? Certainly. But probable? No.").

A review of the facts shows that CIT's refusal to extend was only a possibility. It is undisputed that when Sun Cap purchased the Debtors in 2006, Jevic was a struggling company. Per CIT's agreement, Jevic must maintain assets and collateral of at least $5 million in order to access its line of credit.[28] Around December 2007, the Debtors were in danger of defaulting on the agreement. Thereafter, CIT agreed to forbear on defaulting on Jevic if Sun Cap provided a $2 million guarantee, which it did. CIT then repeatedly agreed to extend forbearances through April 2008. Throughout this time, Jevic hired Morris Anderson to provide consulting services. Through its weekly cash flow statements, Morris Anderson projected Jevic's assets to stay above $5 million through May 9th.[29] Jevic also hired Stifel Nicolaus to seek potential buyers for the company.

Around March 20th, Jevic forecasted that its assets would fall below $5 million, in default of CIT's financing covenant, by early

---

[28] "[A]s long as the company kept above the $5 million minimum availability block, that Bank Group, at least for the short term, was going to be supportive." Defs.' App. 6, Dooley Dep. 43:1-7, Aug. 21, 2012 [Adv. Docket No. 216].

[29] *See id.* at 55:12-14.

May.[30]  This concerned CIT, which urged Sun Cap to invest additional money, but Dooley stated that different cash management systems could alleviate some of the problems.[31]  A revised forecast, by Morris Anderson on March 26th, corrected an error in the earlier projections, which appeared to eliminate the problem with CIT's financing covenant through June.[32]  With the credit problem believed to be behind it, Jevic implemented a reorganization plan that closed four unprofitable facilities and sold unused assets for the benefit of CIT.[33] Full implementation of the plan was to take place by June where Jevic was expected to realize approximately $1.1 to 1.4 million in monthly savings.[34]

In late April, Jevic's projections changed again due to increasing fuel costs, decreasing sales compared to their projections, and low equipment appraisals.  CIT was concerned that Jevic's assets would fall below $5 million sometime in early May.  And by the end of April, Jevic's assets fell below $5 million, in default of CIT's financing covenant.  But, CIT again agreed to extend forbearance until May 12th.

During April and into May, Jevic met with two potential buyers and sought capital from the NJEDA.  However, none of these options panned out.  On May 13, 2008, CIT terminated the credit facility when Sun Cap refused to invest additional funds.  Sun Cap also refused to fund a proposed sale to Pitt-Ohio.  With no viable sale or funding available to Jevic, and with the forbearance agreement expired, Jevic's board formally authorized a bankruptcy filing and WARN notice was sent that day.[35]

These events are indicative of a company attempting to stave off layoffs, and attempting to save jobs and the company.  The Court does not doubt that CIT refusing to extend forbearance was a possibility.  However, it was not necessarily the probable outcome at the time

---

[30] See id. at 110:23-111:17.

[31] See id.

[32] See id. at 117:17-118:6 (stating that the revised forecast gave CIT "a little bit more positive news" and "they seemed to be more supportive than they had been previously").

[33] See id. at 64:12-23 ("The turn-around plan that management put together indicated that the company had a chance of survival" without additional capital investment as of February 2008.); see also id. at 131:22-132:14.

[34] See Defs.' App. 45-46, Gorman Dep. 208:1-209:14, Sept. 4, 2012 [Adv. Docket No. 216].

[35] The WARN notice, although dated May 16, 2008, was not received by employees until Monday, May 19, 2008.

WARN notice was required.[36]  It would run counter to the WARN Act's
policy of encouraging employers to take all reasonable actions to
preserve the company and the jobs to impose liability upon the Debtors
for not giving notice sooner than they did.  *See In re Flexible Flyer
Liquidating Trust*, 2013 WL 586823, at *4.  The Court also finds the Third
Circuit's elaboration of potential problems with forcing companies to
give WARN notice too early particularly illuminating:

> In addition to circumventing the regulations, plaintiffs'
> approach would raise several potential problems.  Because
> plaintiffs' view might require an employer to provide
> frequent WARN notice, it could require an economically
> viable employer to provide notice of a possible-but-unlikely-
> closing.  Once the employer's creditors learn of the notice,
> they may seek to enforce existing debts and become
> unwilling to extend the employer more credit.  In addition,
> employees may overestimate the risk of closing and
> prematurely leave their employer, forfeiting (among other
> things) seniority and unvested benefits.  Such behavior by
> creditors and employees would increase the chance that an
> employer will be forced to close and lay off its employees,
> harming precisely those persons WARN attempts to protect.

*Hotel Employees & Rest. Employees Int'l Union Local 54 v. Elsinore Shore
Assocs.*, 173 F.3d 175, 185 n.7 (3d Cir. 1999).

Class Plaintiffs argue that a lender's decision to call its loans on a
financially struggling company is not unforeseeable.[37]  They cite *United
Paperworkers Int'l Union, AFL-CIO, CLC v. Alden Corrugated Container
Corp.*, which states in part "[i]n the exercise of commercially reasonably
business judgment, Alden and Bates could have anticipated by the end
of 1990 that their plants would be forced to close, and, therefore, could
have given the notification required by the WARN Act."  901 F. Supp.
426, 443 (D. Mass. 1995).  However, as the Court detailed above, it was
not commercially reasonable to pull the plug on Jevic in March because
CIT's refusal to extend forbearance was only a possibility, not a
probability.[38]  *See In re Advanced Accessory Sys., LLC*, 443 B.R. 756, 765

---

[36] The Court notes that while the DOL specifically provides that the Faltering
Company exception should be narrowly construed, there is no such provision
for the Unforeseeable Business Circumstances exception.  *Compare* 20 C.F.R.
§ 639.9(a) *with id.* § 639.9(b).

[37] *See* Pls.' Op. Br. 20 [Adv. Docket No. 192].

[38] Class Plaintiffs also argue that CIT gave Jevic no assurance that funding
would always be available or that forbearances would always be granted.  *See*

(Bankr. E.D. Mich. 2011) ("The Court finds that Defendant's actions in January and early February 2009 were consistent with those of similarly situated employers and were commercially reasonable attempts to keep the business afloat long enough to sell…."); *Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 588 (7th Cir. 2005) ("We believe that a reasonable company in Andersen's position would have reacted as it did. Confronted with the possibility of an indictment that threatened its very survival, the firm continued to negotiate with the government until the very end and turned to layoffs only after the indictment became public."); *Loehrer v. McDonnell Douglas Corp.*, 98 F.3d 1056, 1062 (8th Cir. 1996) ("Furthermore, while McDonnell Douglas admittedly was aware of the Government's dissatisfaction with the cocontractors' performance, that knowledge alone cannot in this case suffice to prevent the operation of the exception for unforeseeable business circumstances."); *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 877 (10th Cir. 2009) ("While the situation leading up to United's eventual termination of the primary supplier relationship 'would undoubtedly raise the eyebrows of any prudent businessperson,' the evidence does not suggest that United's decision was reasonably foreseeable prior to HHC's receipt of the January 15 letter.") (quoting *Loehrer*, 98 F.3d at 1062); *In re Flexible Flyer Liquidating Trust*, 2013 WL 586823, at *3 ("All of the evidence proffered thus shows that the focus of Flexible Flyer's management was on saving the company, not planning for an upcoming shutdown….").

Moreover, the Court finds that CIT's ultimate decision not to extend the forbearance was out of the Debtors' control. CIT gave Sun Cap the option of an additional investment in exchange for another extension, but Sun Cap was not willing to invest. The Court will not impute Sun Cap's refusal to invest additional money to the Debtors.[39]

---

Pls.' Reply Br. 14 [Adv. Docket No. 218]. However, the Court does not find this argument determinative. The facts discussed above show that CIT had extended forbearance numerous times and Sun Cap negotiated and invested as needed. With the projections and reorganization plans taking full effect in June, it was not commercially reasonable for the Debtors to send out WARN notices in March.

[39] Class Plaintiffs cite *Raroc* for the proposition that failed negotiations between two parties are not outside of their control. *See Hotel Employees & Rest. Employees Int'l Union v. Raroc, Inc.*, No. 99 CIV. 3078 MBM, 2000 WL 204537, at *5 (S.D.N.Y. Feb. 22, 2000). *Raroc* involved a company negotiating a lease with a property owner. It does not involve a parent company and

Jevic had no control over whether Sun Cap invested additional funds. Jevic also had no control over whether Sun Cap would bridge the sale to Pitt-Ohio.  Having exhausted all of its options in financing and after CIT's refusal to extend the forbearance, the Debtors then had no other choice but to file for bankruptcy.

The Court also finds that the Debtors' layoffs were caused by CIT's refusal to extend forbearance.  *See Gross v. Hale-Halsell Co.*, 554 F.3d 870, 876 (10th Cir. 2009) (stating that a company must establish that the circumstance was both unforeseeable and caused the layoffs to invoke this exception).  When asked why Jevic terminated its employees, Dooley responded that "[t]he lender declined to fund an ongoing operation."[40]  Dooley then goes on to state other reasons for why its lender would not provide additional funds—inability of the business to be profitable, increasing gas prices, recession, closure of facilities which had an adverse reaction among the customer base, struggling business model—but the "immediate precipitant of the decision to terminate employees" was CIT's refusal to extend forbearance.[41]  This undisputed testimony, even cited by the Class Plaintiffs,[42] satisfies the causation issue.  Thus, the Court finds that there are no genuine issues of material fact that the Debtors are entitled to the Unforeseeable Business Circumstances exception.

### E.  New Jersey WARN Act

The Court now turns to Class Plaintiffs' claims under the New Jersey WARN Act.  The New Jersey WARN Act was modeled after the its federal counterpart.  *See DeRosa v. Accredited Home Lenders, Inc.*, 22 A.3d 27, 36 (N.J. Super. Ct. App. Div. 2011).  However, the New Jersey WARN Act does not provide for any exceptions.  *See* N.J. Stat. Ann. § 34:21-2 (2007).  As previously discussed, it is undisputed that the Debtors violated the WARN Act by not providing its employees with the required 60-day notice before terminating its employees.  While the Court finds that the Debtors satisfy the Unforeseeable Business Circumstances exception under the federal WARN Act, there is no such exception under the New Jersey WARN Act.  Therefore, the Court finds

---

therefore, this case is distinguishable because the Debtors had no control over whether Sun Cap made an additional investment.

[40] Pls.' App. 304, Dooley Dep. 254:2-11, Aug. 21, 2012 [Adv. Docket No. 193].

[41] *Id.* at 254:22-256:4.

[42] *See* Pls.' Op. Br. ¶ 55 [Adv. Docket No. 192].

that there is no genuine dispute of material fact that Class Plaintiffs are entitled to recovery under the New Jersey WARN Act.[43]

## V. CONCLUSION

For the foregoing reasons, the Court finds that there is no genuine issue of material dispute that the Debtors are insulated from liability by the Unforeseeable Business Circumstances exception to the WARN Act.  The Court also finds that the Debtors are not insulated for violations under the New Jersey WARN Act.  Therefore, the MSJ is **GRANTED in part** and **DENIED in part**.  An appropriate Order follows.

**BY THE COURT**:

Dated: May 10, 2013
Wilmington, Delaware

Brendan Linehan Shannon
United States Bankruptcy Judge

---

[43] The Court notes that Debtors do not dispute their liability under the New Jersey WARN Act in either their submissions to the Court or at oral argument.